UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

B&P Littleford, LLC,

                    Plaintiff,

v                                                    Case No. 18-11425
                                                     Honorable Thomas L. Ludington
Prescott Machinery, LLC,
Ray Miller

                    Defendants.
_____/

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

On May 7, 2018, Plaintiff B&P Littleford, LLC ("B&P") filed a nine-count complaint

against Defendants Prescott Machinery, LLC ("Prescott") and Ray Miller. On April 24, 2019, a

stipulation was entered that dismissed Counts 2 and 4 through 9 of Plaintiff's Complaint. The

stipulation further granted Plaintiff leave to file an Amended Complaint to include only Count 1

(Violation of the Federal Defend Trade Secrets Act) and Count 3 (Violation of the Michigan

Uniform Trade Secrets Act) of the initial Complaint. ECF No. 44 at PageID.981.

## I.

## A.

According to its Complaint, Plaintiff designs and manufactures "a wide variety of highly

engineered mixers, dryers, extruders, compounders, kneaders, reaction vessels, Podbielniak

Centrifuges, and centrifugal separation equipment for manufacturing applications." ECF No. 1 at

PageID.3. From 1911 to 1987, Plaintiff B&P was incorporated as Baker Perkins, Inc. ECF No. 45

at PageID.984. In 1987, Baker Perkins merged with APV Chemical Machinery and became known

as "APV". *Id.* Defendant Miller was APV's General Manager until 1995 when APV sold its

chemical division to an entity newly formed by Miller and others, B&P Process Equipment and Services, LLC ("B&P"). *Id.*

Miller was employed at B&P in various capacities, including as a board member and B&P's President and Chief Executive Officer. ECF No. 1 at PageID.4. Miller's employment gave him access to B&P's confidential and trade secret information. *Id.* at PageID.5. In 2008, Miller's employment at B&P ended. *Id.* According to Plaintiff, Miller was terminated "after some questionable activities." ECF No. 78-2 at PageID.2785. More specifically, because he "breached his fiduciary, contractual and other duties to B&P, caused B&P to write checks to a company in which Miller had an interest…, misappropriated opportunities of B&P, and engaged in other wrongful actions and inactions." *Id.* at PageID.2794-2795. As part of his termination, he entered into a confidential settlement and release agreement with Plaintiff in which he represented

> Since July 31, 2008, [Miller] has not had and does not have physical possession of or access to any customer lists, software, records, manuals, equipment, drawings, blue prints, or confidential proprietary information of or about B&P, whether hard copy or electronic. Nor has Miller given any such materials or information to any other person for any purpose other than to advance the business interests of B&P.

ECF No. 1 at PageID.6. Soon after ending his employment with Plaintiff in 2008, Miller started the company Prescott Machinery, LLC where he currently serves as its president. *Id.*

**B.**

A few years after Miller stopped working for Plaintiff, Plaintiff learned that Miller had misappropriated a number of Plaintiff's trade secrets. In 2012, Plaintiff's Director of Engineering, Timothy Coughlin, prepared an affidavit in which he compared two drawings from Prescott (Exhibits 1 and 2) with two drawings from B&P (Exhibits 3 and 4). Coughlin testified that:

> Exhibits 1 and 2 were generated from B&P drawings of Exhibits 3 and 4…[I]t is difficult to believe that Exhibits 1 and 2 could have been specified, engineered and detailed without using B&P prints as a source of such information…[M]y reasons are as follows:

- The parts are nearly identical. Where they differ are in seemingly unimportant details that would generally be overlooked during modeling;

- That the location of most dimensions and notes are nearly identical;

- That the wording of individual notes is nearly identical;

- That tolerances are identical;

- That there is generally no technique to reverse-engineer tolerances;

- That surface finishes are identical;

- That the material call-out and coating call-out are very specific and used for only one process;

- That the material call-outs are identical to the B&P material call-outs;

…[T]he similarities in these exhibits clearly indicate that B&P digital information was utilized by Prescott Machine, to produce the drawings provided to B&P's vendor, who subsequently provided such drawings to B&P;

That I have been advised that Ray Miller is a principal of Prescott;

That I am advised that Ray Miller was previously CEO of B&P and had access to B&P's confidential information, including access to digital data from which B&P drawings could be reproduced.

ECF No. 78-2 at PageID.2837-2838.

Plaintiff consulted with the FBI on several occasions in 2013, 2014, and 2015 regarding Plaintiff's suspicions of Miller's misappropriation of trade secrets. ECF No. 84 at PageID.3271. It provided a list of at least eight incidents of misappropriation since 2012 in a complaint that it later filed with the FBI. It provided:

1. In 2012 Ray Miller requested a quote from a B & P Vendor for a funnel support…This occurred again with Metaltek in 2014.

2. In 2013 Ray Miller and Robin Aurs rebuilt a B & P machine for Dow. They indicated that they could provide spare parts and bring the machine to OEM specifications. This could not be done without B & P drawings.

- 3 -

3.  In 2013 there was evidence that Cygnys had drawings from Prescott Machinery. These drawings were not shared with B & P because the President of Cygnys indicated that he had a non-disclosure agreement with Prescott.

4.  In November of 2013, Robin Aurs of Prescott Machine contacted a customer indicating that he could repair B & P gear boxes. This particular customer has had gear boxes from B & P. Mr. Aurs also indicated that Ray Miller was also at Prescott Machinery.

5.  In April, 2015, Cygnys again came into play. The president of Cygnys indicated that he had drawings from Prescott (Ray Miller) of a barrel liner, a wear part, from the discharge end of a B & P extruder. While we do not have the drawings, knowledgeable people indicated that it would be impossible to duplicate the dimensions and tolerances without the B & P electronic files.

6.  In November, 2014, Metaltek provided drawings for an inlet funnel for an S-32 pusher centrifuge, Metaltek being a supplier to B & P refused to provide the part but also refused to identify his customer although it is believed to be Ray Miller. The drawings are almost identical to B & P drawings.

7.  In May of 2015, Prescott began to offer on its web page a vertical mixer. B & P's vertical mixer is a major product for B & P. The B & P vertical mixers are used to produce energetic material such as solid rocket fuel. The mixers are licensed by the U.S. Commerce Department with approval of the State Department due to the nuclear nonproliferation concerns…

9.  Robin Aurs allegedly sold B & P replacement parts in China. Robin Aurs approached a B & P customer in Norway and stated the he is working with Ray Miller. He claimed to be able to do rebuild work and supply parts meeting OEM specifications.

ECF No. 78-2 at PageID.2793.

## C.

On July 15, 2015, Plaintiff submitted a formal complaint to the FBI.[1]  It consisted of a

cover letter written by Plaintiff's attorney John B. Hardaway to Special Agent Anthony Kraudelt

---

[1] Plaintiff furnished this complaint to Defendant during the course of discovery. Defendant alleges that Plaintiff did not furnish this complaint until "the day before the deposition of B&P's

as well as accompanying documents supporting Plaintiff's claim. ECF No. 78-2. Plaintiff listed Miller as "Suspect #1", alleging that Miller possessed "the entire electronic files of B & P's technical drawings" and was using them "to produce products for sale in Norway, China[,] Bulgaria, [and] South Korea." *Id.* at PageID.2791, 2853. Plaintiff represented that it possessed proof of these sales in "e-mail communications and potential testimony." *Id.* Plaintiff also stated that Robert Auers, a "past field service technician", worked for Miller and was "believed to have some access to B&P drawings and probably through Mr. Miller the *entire* electronic file." *Id.* at PageID.2785 (emphasis added). Plaintiff made a similar assertion regarding another former B&P employee who potentially possessed "the *entire* B&P electronic document file." *Id.* at PageID.2786 (emphasis added).

In the FBI complaint, Plaintiff stated that it became aware of the misappropriations when "[t]he information began appearing in 2012." *Id.* at PageID.2791. It also represented that the "[e]stimated time period of illegal distribution" exceeded four years. *Id.* at PageID.2845. The FBI complaint is dated July 15, 2015. Accordingly, Plaintiff estimated that the date of illegal distribution to have occurred as early as July 2011.

The FBI declined to pursue an investigation into the allegations of Plaintiff's 2015 complaint. In 2018, Plaintiff again contacted the FBI about the alleged trade secret misappropriation. However, the FBI again declined to pursue criminal prosecution. Accordingly, Plaintiff filed a civil complaint against Prescott and Miller on May 7, 2018.

**D.**

---

CEO, Larry Slovin,…claiming the 2015 FBI Complaint was 'inadvertently' left out of its prior productions and had been 'overlooked.'"

Plaintiff's original civil complaint alleged that Defendant had misappropriated the trade secrets to a 16 PVM Planetary Vertical Mixer ("Mixer"). The Mixer had been installed in the 1960s at the United States Navy's Surface Weapons Center at China Lake, California. *Id*. Plaintiff developed the Mixer in order to "provide a high speed mixer with close tolerances to improve over other mixers in the marketplace." *Id.* at PageID.7. On July 25, 2017, the Navy issued a Request for Proposal to "retrofit and overhaul the Mixer." *Id.* That same day, Prescott submitted a response to the Request for Proposal. On February 8, 2018, the Navy awarded the contract ("China Lake contract") to Prescott. A B&P vendor subsequently received copies of Prescott's drawings because the vendor was asked to supply parts for the China Lake contract.[2] *Id*. The vendor provided these drawings to Plaintiff. *Id*. Plaintiff alleges that "[a] review of Prescott's drawings and schematics received from the vendor shows that B&P's confidential and trade secret technical drawings were used in Prescott's attempt to source parts for the Navy's contract." *Id.* at PageID.8.

### E.

On October 8, 2018, Defendants filed a Motion for Protective Order and Related Relief largely objecting to the scope of Plaintiff's discovery requests. Defendants contended that Plaintiff was seeking discovery related to alleged trade secret misappropriations unrelated to the Mixer, characterizing the requests as a "fishing expedition." ECF No. 17 at PageID.175. On October 16, 2019, Plaintiff responded with a motion to compel. ECF No. 21. The motions were referred to Magistrate Judge Morris who held a hearing on November 20, 2018. ECF No. 31. She granted the motions in part and denied them in part. During the hearing, she explained that the scope of discovery should be governed in substantial part by the scope of the Plaintiff's factual allegations in the complaint, specifically those drawings and trade secret information related to the project at

---

[2] Plaintiff's amended complaint does not specify the date the third-party vendor received copies of these drawings.

issue in Plaintiff's complaint, the Mixer and the China Lake contract. During the hearing, Judge Morris held:

> It's the single project and it's five drawings. I think that the scope of discovery should allow the plaintiff to seek information about both those things in the sense that plaintiff should not be limited to the five drawings, but rather any drawings or other information that was misappropriated by Miller to Prescott and how that happened, or how Prescott got it, whether it was through Miller or someone else, relating only to this project.

ECF No. 32 at PageID.650-651. Accordingly, the scope of discovery was limited to discovery related to the Mixer and the China Lake contract. The close of discovery was originally scheduled to occur on January 11, 2019. ECF No. 14. However, on January 18, 2019, the parties stipulated to extend the discovery deadline to April 22, 2019. ECF No. 35. On April 11, 2019, the parties again stipulated to extend the discovery deadline, setting it for May 13, 2019. ECF No. 42.

On April 5, 2019, Plaintiff filed a motion to amend its complaint. ECF No. 41. On April 25, 2019, a stipulated order was entered permitting Plaintiff to amend its complaint. ECF No. 44. Plaintiff's amended complaint added allegations of misappropriation by Defendants in addition to those presented in its initial complaint regarding the Mixer. The amended complaint provides

> Defendants have misappropriated additional documents, drawings, and other confidential, proprietary, and trade secret information wholly unrelated to the Mixer or the Navy's RFP, but that belongs to B&P and is being used by Miller and/or Prescott to B&P's detriment and damage.

ECF No. 45 at PageID.995.

Two weeks after filing its amended complaint and five days before the close of discovery, Plaintiff filed a motion to compel, seeking answers to seven interrogatories and five production requests that Plaintiff had requested seven months prior in November 2018. ECF No. 47. Since initially requesting this material from Defendants in November, Plaintiff alleged that it had "been unable to obtain any discovery from Defendants outside of documents and drawings related to

China Lake and the Mixer." ECF No. 69 at PageID.1802. The motion was referred to Judge Morris who held a hearing on June 4, 2019. ECF No. 51. She denied Plaintiff's motion to compel and held that:

> Plaintiff's Motion to Compel (R. 47) is DENIED as untimely. Plaintiff's Amended Complaint may have expanded the scope of discovery but it did not automatically trigger a need to supplement all previous discovery requests.

ECF No. 68 at PageID.1792.

A month and a half after the close of discovery, Plaintiff filed a motion to reopen discovery. ECF No. 69. Plaintiff sought to obtain responses to the seven interrogatories and five production requests that it had previously sought. *Id.* at PageID.1795. Plaintiff alleged that these are "**identical** to 7 Interrogatories and 5 Production Requests found in Plaintiff's first discovery requests served on Defendants in November **and identical** to the 7 Interrogatories and 5 Production Requests for which Plaintiff sought 'initial and/or supplemental production' from Defendants on April 26, 2019." *Id.* at PageID.1795-1796 (emphasis in original). The motion was denied because Plaintiff had been aware of the information learned in discovery since the beginning of discovery and did not seek to amend its complaint until the discovery period had nearly expired. ECF No. 86.

On July 1, 2019, Defendant filed a motion for summary judgment. ECF No. 72 at PageID.1895. For the following reasons, the motion will be granted.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party

who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52.

## III.

In its Motion for Summary Judgment, Defendant presents two arguments. First, Defendant argues that Plaintiff's federal Defend Trade Secrets Act and Michigan Uniform Trade Secrets Act claims are barred by a three-year statute of limitations. Second, Defendant claims that the technical drawings Plaintiff refers to in its complaint do not meet the statutory definition of "trade secrets" because Plaintiff did not undertake reasonable efforts to maintain secrecy.

## A.

The Defend Trade Secrets Act § 1836(d) provides, "A civil action … may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered…. [A] continuing misappropriation constitutes a single claim of misappropriation." Likewise, the Michigan Uniform Trade Secrets Act § 445.1907 provides, "An action for misappropriation must be brought within 3 years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. For the purposes of this section, a continuing misappropriation constitutes a single claim."

## 1.

Both the Federal Defend Trade Secrets Act (DTSA) and the Michigan Uniform Trade Secrets (MUTSA) were modeled on the Uniform Trade Secrets Act (UTSA), which had been

adopted in forty-seven states and the District of Columbia by 2016.[3] *See* S. Rep. No. 114-220 (2016); M.C.L. § 445.1901. Before the adoption of the DTSA in 2016, the only option at the federal level was criminal prosecution under the Economic Espionage Act, which required an "interstate or foreign nexus." S. Rep. No. 114-220, at 3 (2016); *see also* 18 U.S.C. § 1832.

Before the Uniform Trade Secrets Act was drafted, "jurisdictions were split on whether the limitations period ran only from the initial misappropriation, or whether it was triggered anew with each act of misappropriation." *Kehoe Component Sales Inc. v. Best Lighting Products*, 796 F.3d. 576, 583 (6th Cir. 2015). The difference arose from whether a jurisdiction viewed the misappropriation of trade secrets as "in the nature of property, which is damaged or destroyed by [each] adverse use," or a breach of the relationship between the parties, which is "not torn anew with each added use or disclosure, although the damage suffered may thereby be aggravated." *Id.* (citing *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.,* 407 F.2d 288, 293 (9th Cir.1969) (explaining *Underwater Storage, Inc. v. U.S. Rubber Co.,* 371 F.2d 950, 955 (D.C.Cir.1966)). The "UTSA's declaration that 'a continuing misappropriation constitutes a single claim' expressly adopts the latter approach and rejects the former." *Id.* Indeed, the official comment to section six of the UTSA provides, "This Act rejects a continuing wrong approach to the statute of limitations but delays the commencement of the limitation period until an aggrieved person discovers or reasonably should have discovered the existence of misappropriation. If objectively reasonable notice of misappropriation exists, three years is sufficient time to vindicate one's legal rights." USTA § 6 & cmt.

**2.**

---

[3] "[T]he Committee does not intend for the definition of a trade secret to be meaningfully different from the scope of that definition as understood by the courts in states that have adopted the UTSA." S. Rep. No. 114-220 at 10 (2016).

In addition to the express language of the DTSA, a survey of the relevant case law applying the DTSA demonstrates Plaintiff's claims are time-barred by the statute of limitations. First, in *Kehoe Component Sales Inc. v. Besting Lighting Products, Inc*., a manufacturer ("Pace") copied a former collaborator's ("Best") lighting products and marketed them as its own. 796 F.3d. at 580. The parties worked together starting in 2000, yet by 2004, Best suspected Pace of using its products. *Id*. Indeed, Best emailed Pace's president "complaining that Pace not only had begun selling products that were identical to the products that it made for Best, but also that Pace had begun selling them to Best's established customers." *Id*. at 580-581. Nevertheless, the parties continued collaborating, though their "interactions … [were] filled with strife." *Id* at 581. However, it was not until August 2008 that Pace filed its Complaint. *Id*.

After the district court found that Pace was liable, Pace appealed, arguing that Best's trade secrets were time-barred by the statute of limitations. *Id*. at 582. Though "the district court concluded that Best's filing was timely because Pace misappropriated Best's trade secrets with respect to know-how *again*, - i.e. after August 2004," the Sixth Circuit held that '[t]he district court's reasoning was incorrect." Accordingly, the Sixth Circuit concluded,

> The district court, in concluding that OUTSA's[4] limitation period was retriggered by Pace's continued use of the same trade secret, improperly reverted to a property-based theory of trade-secret misappropriation, under which each successive use of a trade secret is an additional wrong. That theory was rejected with the adoption of the OUTSA.

*Id*. at 583. The Sixth Circuit also rejected Best's arguments that Pace misappropriated different trade secrets at different times, finding, on the contrary, that the "trade secrets that Pace misappropriated was the unitary, generalized knowledge of the lighting design and manufacturing process that it had learned from Best." *Id* at 584. Finally, the Sixth Circuit rejected Best's argument

---

[4] The Ohio Uniform Trade Secret Act, OH ST § 1333.66, is also based on the Uniform Trade Secrets Act. OH ST T. XIII, Ch. 1333, Refs & Annos.

that it was not injured until 2007, finding that "[c]learly Best was aware that it had been injured by competing sales as early as August 2004." *Id*.

Second, in *Adcor Industries, Inc. v. Bevcorp, LLC*, Adcor appealed the district court's summary judgment order dismissing Adcor's trade secrets claim as time-barred. 252 Fed.Appx. 55, 57 (6th Cir. 2007). Starting in 1967, Baron Haag and Chester Rome, through their company Brau, were involved in paying "employees of Crown Cork and Seal … to obtain drawings of Crown parts and other proprietary information … to manufacture replacement parts for Crown beverage fillers." *Id*. at 58. In 1998, a consent decree was entered following a civil case that forbade Haag and Romp from manufacturing or obtaining, other than from Crown, parts for refurbishing Crown beverage fillers and using Crown's trade secrets. *Id*. at 58.  The decree also required Haag and Rome to inform employees, customers, and the public that they would no longer partake in the business of manufacturing Crown parts. *Id*. The decree applied to their "successors, assigns, affiliates, agents, representatives, heirs, administrators, executors, family members, and any person dealing directly or indirectly through them or in concert with them." *Id*.

In 1991, a series of Bevcorp businesses were founded by employees of Brau Manufacturing, the company owned by Haag and Chester, which serviced, refurbished, and sold replacement parts for Crown beverage fillers*, inter alia*. *Id*. In 1992, Bevcorp Properties purchased equipment from Brau and moved into Brau's former building. *Id*. In December 2000, Adcor acquired assets of Crown entities, including its drawings. *Id*.

In affirming summary judgment, the Sixth Circuit concluded that Adcor, who filed suit in 2003, did, prior to 1999, "have reason to suspect, … did not investigate those suspicions, and … affirmatively forwent – for economic reasons, bringing a claim" *Id*. at 60. The Sixth Circuit emphasized that the discovery rule, which applied to Ohio's Uniform Trade Secrets Act, meant

that one should "count time from when the trade secret's owner *could have* discovered the misappropriation, rather that when the wrong first occurred." *Id*. at 60. The Court held that "Crown suspected misappropriation before Adcor purchased it trade secrets," as evidenced by former employees' testimony, some of whom eventually joined Adcor. *Id*. at 61. Furthermore, "two employees statements show that the delay in bringing suit was a strategy deadlock: Crown and Adcor vacillated on whether to sue or buy Bevcorp until it was too late." *Id*.

Likewise, the Sixth Circuit rejected Adcor's argument that there were additional misappropriations in 2000. *Id*. at 62. The Sixth Circuit concluded that the relevant Ohio statute "clearly forecloses [that] argument, by providing, "For the purposes of this section, a continuing misappropriation constitutes a single claim." *Id*. (quoting Ohio Rev. Code Ann. § 1333.66). Indeed, the Sixth Circuit restated the district court's conclusion that "Adcor's interpretation of the limitation statute (i.e., that each misappropriation would trigger a new limitations period) would render the statute meaningless." *Id*.

Third, in *Stolle Machinery Co., LLC v. RAM Precision Indus*, a case both parties rely on, Stolle suspected a former employee, Shu An, of misappropriating trade secret design drawings when he returned to his native China in early 2003. 605 Fed. Appx. 473, 476 (6th Cir. 2015). In late 2003, a Stolle sales representative in China wrote an email to the President of Stolle Machinery, Greg Butcher, with the subject "Shu An" in which he stated, "Sounds like he has all the drawings. I am having Qiong get his address over here for possibility of legal action." In December 2003, Mr. Butcher sent a letter to Stolle's suppliers alerting them that Mr. An was "using, manufacturing, and selling Stolle post-repair, conversion equipment, tab, and lane die tooling in China." *Id*. at 476-77. However, litigation was not pursued because Mr. An was a "Chinese nationalist[sic] … hiding in China." *Id*. at 477. Accordingly, the Sixth Circuit concluded

that the district court was correct in finding Stolle's 2010 claim against Mr. An was time-barred. *Id*. at 482. However, the Sixth Circuit did not come to the same conclusion with respect to the other defendant, SLAC, the company Mr. An founded. *Id*. Indeed, the Court stated, "The district court treated the statute-of-limitations analysis identically as to both An and SLAC, but this was a mistake." *Id*. at 483. SLAC was not founded until 2004 and the court was thus "unable to identify evidence in the record that conclusively demonstrate[d] that Stolle should reasonably have discovered SLAC's alleged trade secret misappropriation before late 2006."[5] *Id*. The Court concluded that, with respect to the trade secrets claim against SLCA, additional "evidence may emerge at trial, but at this point we hold that a genuine question of material fact exists." *Id*.

However, in *Amalgamated Industries Ltd. v. Tressa, Inc.*, a manufacturer and distributor of hair care products' ("Tressa") unsuccessfully appealed a district court judgment that Tressa had misappropriated Amalgamated Industries Ltd.'s (AIL) trade secrets. 69 Fed.Appx. 255 (6th Cir. 2003). The parties entered into agreement in 1989, with AIL granting Tressa an "exclusive license to manufacture and sell professional hair care products developed from AIL's information, technical data, processes, formulas and other data." *Id*. at 256. In 1990, Tressa filed a complaint against AIL alleging breach of contract and AIL counterclaimed for misappropriation of trade secrets. *Id* at 257. Following a bench trial, a judgment was issued stating that AIL had breached the Agreement and Tressa has misappropriated AIL's trade secrets. *Id*.

In 1995, Tressa informed AIL that it had reformulated the hair color shades and would thus be decreasing royalty payments to AIL as it started selling its new formulations. *Id*. at 258. Since the decrease in royalties would affect damages from the prior litigation, the parties convened a conference call with a Magistrate Judge. *Id*. The call resulted in reopening the prior litigation and

---

[5] The Ohio Uniform Trade Secrets act has a four-year statute of limitations. Ohio Rev. Code Ann. § 1333.66.

setting a schedule for discovery. *Id*. During discovery, AIL found that Tressa had developed two more hair color products using its trade secrets. *Id*. The parties agreed to consolidate the action with the prior litigation, but the Magistrate Judge instead removed the prior litigation from the docket and advised AIL to pursue a new lawsuit. *Id*.

In holding the AIL's new claim was not barred by the statute of limitations, the Sixth Circuit highlighted that "the National Conference of Commissioners on Uniform State Laws ... rejected the continuing tort approach," instead "focus[ing] … on the breach of the relationship between the parties at the time the secret is disclosed." *Id* at 261. Indeed, the "unanimous conclusion of courts considering this issue [was that] that a *claim* for misappropriation arises only once for statute of limitation purposes – at the time of the initial misappropriation, subject to the discovery rule. *Id*. Accordingly, "[e]ach misappropriation of that same Information[sic] obtained from AIL as part of the original Licensing Agreement constitute[d] another misuse, but not another claim for purposes of the states of limitations." *Id*. at 262. As AIL filed its original complaint within three years of the initial act of misappropriation, its claim in subsequent litigation was saved. *Id*. The Sixth Circuit held that the district court "should not have closed the prior litigation, and the [subsequent] case should have been seen as part of that claim, which was in fact filed well within the limitations period set by the Act." *Id*. at 263.

Finally, in *Kendall Holdings Ltd. v. Eden Cryogenics LLC*, a case Plaintiff relies on, PHPK (Kendall) appealed the district court's grant of summary judgement to Eden on its misappropriation of trade secrets claim. 521 Fed.Appx. 453, 454 (6th Cir. 2013). Eden's founder, Hensley, worked in the cryogenics industry since 1967. *Id*. At one time, he was the Vice President of Standard Products for CVI, Inc., a cryogenics company. *Id*. Mitchell, another Eden employee, also worked at CVI. *Id*. In 1991, CVI's founder created PHPK. *Id*. In 1995, Hensley and Mitchell

were hired by PHPK. *Id.* Sometime between 1998 and 2000, Hensley became president of PHPK. *Id.* Mitchell, who often worked from home, kept many drawings stored at home with Hensley's permission. *Id.* at 455. In 1999, Mitchell stopped working for PHPK, but did not return or destroy any of the drawings he kept at home, nor was he asked to do so. *Id.* Mitchell then resumed working at Chart (formerly CVI), a competitor of PHPK's. *Id.*

In 2004, PHPK was purchased by Kendall Holdings and became Kendall Holdings, Ltd., d/b/a/ PHPK Technologies. *Id.* PHPK retained Hensley as president and rehired Mitchell as an independent contractor. *Id.* PHPK subsequently terminated Hensley. *Id.* In 2006, Hensley created a new cryogenics company, Eden. *Id.* Hensley hired Mitchell to help design Eden's standard product line. *Id.*

In 2007, PHPK noticed that customers were purchasing from Eden and began an investigation. *Id.* Litigation ensued, and the district court eventually entered summary judgment in favor of Eden. *Id.* at 455-56. In the appeal that followed, PHPK argued that Mitchell could not have appropriated the trade secrets in 1999 because he had authorization, thus the district court erred in holding the claim was time-barred. *Id.* at 456. The Sixth Circuit agreed, finding "no dispute that Hensley, then President of PHPK, knew that Mitchell retained the show drawings when he terminated Mitchell in 1999. *Id.* The Sixth Circuit emphasized that "misappropriation under the statute requires acquisition by improper means." *Id.* A "genuine issue of material fact exist[ed] concerning the scope of PHPK's consent," as "a reasonable fact finder could conclude that if any misappropriation occurred it occurred in 2006, when Mitchell used the drawing while designing products for [Eden]." *Id.* at 459. Indeed, "[n]o amount of reasonable diligence could enable a plaintiff to discover an injury that has not yet occurred." *Id.* (*quoting MAR Oil Co. v. Korpan*, No. 3:11-cv-1261, 2011 WL 5023262, at *3 (N.D. Ohio Oct. 20, 2011)).

**B.**

Here, Plaintiff was aware of the trade secret misappropriation in 2012, but did not file its complaint until 2018. In Plaintiff's 2015 response to the FBI's question, "When did you become aware of possible trade secret misappropriation," Plaintiff stated, "The information began appearing in 2012." ECF No. 78-2 at PageID.2791. Furthermore, a 2012 affidavit by Plaintiff's Director of Engineering demonstrates that Plaintiff had already compared Defendants drawings with their own and concluded that "computer-aided design software was utilized to generate [Prescott Machine prints] from B&P drawings." *Id*. at PageID.2837

The facts of Defendant's claim relate to the aforementioned case law in the following ways. First, as discussed in section 2, *supra*, under the DTSA and MUTSA, the statute of limitations expires 3 years after the date on which the action is or should have been discovered, and a continuing misappropriation constitutes a single claim. *See* 18 U.S.C. § 1836(d); M.C.L. § 445.1907. In attempting to restart the clock after the award of the China Lake contract, Plaintiff is trying to revert back to a pre-UTSA property-based theory of trade secret misappropriation that the Sixth Circuit rejected in *Kehoe Component Sales Inc.,* 796 F.3d. at 583. Accordingly, neither the trade secrets related to the China Lake project nor the other trade secrets added in Plaintiff's Amended Complaint are timely.

As explained above, Plaintiff's 2015 complaint to the FBI demonstrates that Plaintiff was aware of the misappropriation as early as 2012. Regarding the China Lake project, Plaintiff attempts to characterize its discovery of the misappropriation to have occurred in 2018. However, Plaintiff's 2015 letter to the FBI states that Miller possessed "the entire electronic files of B & P's technical drawings" since 2012. ECF No. 78-2 at PageID.2791. The drawings for the China Lake project were presumably among those taken by Miller since according to Plaintiff, the Mixer was

installed in the 1960s and would therefore be present in the "entire electronic files of B&P." Finally, though Plaintiff states that "Defendants alleged activities from 2009 to 2015 show 'little more than a demonstrated intent to compete in the marketplace,'" the Sixth Circuit determined in *Kehoe* that knowledge of competing sales is sufficient to constitute an injury. *Kehoe Component Sales Inc.,* 796 F.3d. at 584.

Second, in its own brief, Plaintiff states that it "heard between 2012 and 2013, [that] Defendants had requested a quote for a funnel support, rebuilt a B&P machine, and offered to repair B&P gear boxes." ECF No. 83 at PageID.3195. Plaintiff declared that "[t]his rumor troubled B&P, but it was disinclined to reignite caustic and costly litigation with Miller." *Id*. Plaintiff further states that it was "increasingly concerned upon learning from two vendors in 2014 and 2015 that Defendants may have possessed B&P's trade secrets." *Id*. at 3196. However, Plaintiff was still "reticent to wade into litigation," "recalling the toll on time and resources the last time in entered the fray with Miller." *Id*.

This "reticence" because of "costly litigation" has also already been rejected by the Sixth Circuit in *Adcor Industries*. In affirming summary judgment, the Sixth Circuit concluded that Adcor, "ha[d] reason to suspect, … did not investigate those suspicions, and … affirmatively forwent – for economic reasons, bringing a claim." 252 Fed.Appx. at 60. The Sixth Circuit emphasized that the discovery rule, present in most variations of the UTSA, "count[s] time from when the trade secret's owner *could have* discovered the misappropriation, rather that when the wrong first occurred." *Id*.; *See also Intermedics, Inc. v. Ventritex, Inc*., 822 F.Supp. 634, 652 (N.D. Cal. 1993) (holding that the statute of limitations may be triggered even if misappropriation is "relatively inconsequential" and would not, by itself, justify the cost of suit).

Third, unlike *Stolle Machinery Co., LLC v. RAM Precision Indus*, where the statute of limitations had run against one party, Mr. An, but not the other, SLAC (the company Mr. An founded), the statute of limitations has run against both Mr. Miller and Prescott Machinery, LLC, in the present case. In *Stolle*, though there was conclusive evidence that Mr. An was suspected of stealing trade secrets from 2003, SLAC had not been formed at that time. 605 Fed. Appx. at 483. Therefore, the court was unable to conclude that the statute of limitations had run against both parties, though the court allowed that "evidence may emerge at trial, but at [that] point … a genuine question of material fact exists." *Id*. In the present case, Miller started Prescott Machinery in 2008, the same year he left B&P, and continues to serve as its President today. ECF No. 45 at PageID.989. Furthermore, in Timothy Coughlin's 2012 affidavit, both Prescott and Mr. Miller are referenced. ECF No. 78-2 at PageID.2838. Indeed, the affidavit states that the named exhibits "clearly indicate that B&P digital information was utilized by Prescott Machine." *Id.* It also provides "Ray Miller was previously CEO of B&P and had access to B&P's confidential information, including access to digital data from which B&P drawings could be reproduced." *Id*. Therefore, claims against both Defendants, Miller and Prescott, are time barred by the statute of limitations.

Fourth, there is nothing on the record in the present case to suggest any previous litigation between the parties. This differs from *Amalgamated Industries Ltd. v. Tressa, Inc.* in which previous litigation between the parties was filed within three years, thereby saving subsequent misuse claims by adding them to the previous litigation. Indeed, in *Amalgamated*, the Sixth Circuit held that "the National Conference of Commissioners on Uniform State Laws…rejected the continuing tort approach," and instead "focused…on the breach of the relationship between the parties at the time the secret is disclosed." 69 Fed.Appx. at 261, 263. *Amalgamated*'s subsequent

misappropriation would have been barred, but for the Court's decision to see the misappropriation as part of the original claim.

Fifth, unlike *Kendall Holdings Ltd. v. Eden Cryogenics LLC*, where a "genuine issue of material fact exist[ed] concerning the scope of PHPK's consent,"[6] Defendants have not made any allegations that they had B&P's consent to use the drawings. 521 Fed.Appx. at 459. On the contrary, the Complaint specifically alleges that "Defendants have misappropriated … trade secret information." ECF No. 45 at PageID.995.

Finally, with regard to the 2015 FBI Complaint, it is unclear as to why the FBI declined to investigate. Plaintiff does not provide to the Court any response from the FBI to the Complaint. In declining criminal prosecution in the 2018 FBI Complaint, the FBI asserted that the "correct forum for future legal proceedings would be in the civil courts" and that Plaintiff could "seek a civil remedy through either state or federal courts." ECF No. 78-19 at PageID.3157. Presumably, the FBI believed that there was inadequate proof of misappropriation of trade secrets or that there was not a sufficient "interstate or foreign nexus" as required for criminal prosecution under the Economic Espionage Act. 18 U.S.C. § 1832.

Regardless, the statute of limitation provisions under the DTSA and MUTSA and case law are clear: a continuing misappropriation constitutes a single claim. B&P had three years from when it *could have* discovered the trade secret misappropriation. Because the evidence presented is "so one-sided," that B&P suspected Defendants of stealing trade secrets, stating for example in 2012 certain drawings "clearly indicate that B&P digital information was utilized by Prescott Machine," Defendants must prevail as a matter of law. Accordingly, it is unnecessary to consider Defendant's second argument.

---

[6] The Sixth Circuit emphasized that "misappropriation under the statute requires acquisition by improper means." 521 Fed.Appx. at 456.

**IV**.

Accordingly, it is **ORDERED** that Defendant's Motion for Summary Judgement, ECF No. 72, is **GRANTED**.

It is further **ORDERED** that Plaintiff's Amended Complaint, ECF No. 45, is **DISMISSED**.

Dated: September 30, 2019                                          s/Thomas L. Ludington
                                                           THOMAS L. LUDINGTON
                                                           United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 30, 2019.

s/Suzanne Gammon
SUZANNE GAMMON